# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| MPT, Inc. | ) | **CASE NO. 1:04 CV 2357** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Marathon Labels, Inc.,** | ) | |
| **Marathon Durable Labeling** | ) | **Memorandum of Opinion and Order** |
| **Systems LLC, and** | ) | |
| **Polymeric Converting, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

## INTRODUCTION

This matter is before the Court upon a request by the parties to construe disputed patent

claim terms pursuant to *Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995) (en

banc), *aff'd,* 517 U.S. 370 (1996).  Plaintiff MPT, Inc. ("MPT") alleges that Marathon Labels,

Inc., Marathon Durable Labeling Systems LLC, and Polymeric Converting LLC (collectively

"Defendants") have infringed certain claims of U.S. Patent No. 5,417,790 (issued May 23, 1995)

(the "'790 patent") and U.S. Patent No. RE 37,164 E (issued May 8, 2001) (the "'164 patent").

The Court construes the disputed claim terms as follows:

A "release coating" is a covering that permits the easy and complete removal of pressure

sensitive adhesive labels.

"Release coated" means a material having a "release coating."

"Release layer" will not be construed because the claims in which it appears are not at issue.

An "adhesive coating" is a covering of a substance such as a glue or gum, which is capable of holding materials together by surface attachment.  It does not include magnetic materials that affix a label to a metal surface.

The "coating" of Claim 2 of the'790 patent is either the "release coating" or the "adhesive coating" referred to in Claim 1 of the '790 patent.

A "placard" is a structure adapted for supporting a pressure sensitive adhesive backed label.

A "liner" is a material which has a layer that allows for the release of the liner from the adhesive on the back of the placard and is in contact with a pressure sensitive adhesive.

"Transparent" means transmitting light without appreciable scattering in a manner such as ordinary window glass so that objects placed behind the placard are clearly distinguishable.

A "container" is a receptacle for holding items.

An "object" is any article having three dimensions.

"Permanently" means affixed to an "object" or "container" such that a placard permanently attached or affixed to the substrate cannot be removed without damaging the placard or the "object" or "container."

**FACTS**

The inventions claimed in the '790 and '164 patents were invented by Robert Petrou. The original parent application No. 07/955,119 (the "'119 application") was filed on October 1, 1992.  As prosecution continued, the original application was abandoned in favor of continuation-in-part application No. 08/292,882 (the "'882 application"), which was filed on August 19, 1994.  The '882 application eventually issued as the '790 patent and was also prosecuted further as continuation application No. 08/443,202 (the "'202 application").  The '202 application matured into U.S. Patent No. 5,628,858 and eventually reissued as the '164 patent.

MPT alleges that Defendants infringe Claims 1, 2, 3, 4 and 6 of the '790 patent and Claim 1 of '164 patent.  (*See* MPT's Resp. to Sunbelt's 1st Interr. # 12(a)) . Although these claims are distinct, they are all based on the same disclosure.[1]  The patents generally disclose a method of labeling reusable containers.  In a typical embodiment, a placard has an adhesive coating that is protected by a liner.  Separation of the liner from the placard exposes the placard's adhesive coating.  The placard is then substantially permanently attached to the container by the adhesive coating.  The opposite face of the placard has a release coating which is able to receive pressure sensitive adhesive labels.  A first label which corresponds to items in the container is placed on the release coating of the placard.  When the items in the container are changed, the first label is removed and a second label corresponding to the new items is placed on the release

---

[1]    Although a continuation-in-part application may add new material not disclosed in the original application, both patents-in-suit derive from the same continuation-in-part (the '882 application) or a continuation thereof (the '202 application).

3

coating of the placard.[2]

Many of these terms are in dispute and MPT claims numerous variations on this basic concept.  These disputes and the meaning of the claim terms at issue will be resolved below, with reference to the following materials provided by the parties.  First, the patents themselves provide the claims the Court will interpret as well as the specification that supports those claims. ('790 patent; '164 patent).  Second, the prosecution histories (also called file wrappers) of the '119 application, '882 application and '202 application allow the Court to review the arguments that were made before the United States Patent and Trademark Office ("PTO") to obtain allowance of the patents.  ('119 file; '882 file; '202 file).  Also relevant to these file wrappers are certain patents that were discussed with the PTO during patent prosecution.  (*Du Katz*;[3] *Riggsbee*[4]).  Third, the parties have submitted certain technical materials from the relevant scientific field, including technical glossaries and excerpts of technical references.  (*ampef* ;[5]

---

[2]  In a detailed embodiment the patents describe two "release" surfaces and two "adhesive" surfaces.  One release surface is on the liner and is in contact with the placard adhesive surface.  The liner release surface allows the liner to separate from the adhesive surface of the placard.  The second release surface is the release coating of the placard described above.  The placard release surface comes into contact with the adhesive surface of the labels. In some instances, the patent claims and specification vary in their description of these surfaces as either a "coating" or a "layer." This varied usage is discussed in detail below.

[3]  U.S. Patent No. 5,248,536 (issued Sept. 28, 1993).

[4]  U.S. Patent No. 4,767,654 (issued Aug. 30, 1988).

[5]  Association of Manufacturers of Polyester Film website (no citation to website provided).

4

*TLM*;[6] *Tefzel*;[7] *Satas*;[8] *Fairley*;[9] *Avery Dennison*;[10] *Lantz*;[11] *Fasson*[12]).  Fourth, MPT has

submitted lay dictionary definitions of certain claim terms.  (*Webster's*[13]).  Finally, discovery

materials such as deposition testimony and interrogatory answers have been provided.

### STANDARD OF REVIEW

The Court of Appeals for the Federal Circuit recently summarized the principles that

district courts should follow during claim construction.  *Phillips v. AWH Corp.*, 415 F.3d 1303

(Fed. Cir. 2005) (en banc).  The Court must construe claim terms in the manner that they would

be understood by a person of ordinary skill in the art as of the effective filing date of the

application.  *Id*. at 1313.  In some instances the ordinary meaning of a term to a person of

ordinary skill in the art is readily apparent to a lay judge.  *Id*. at 1314.  However, in many cases a

term has a special meaning within the art.  In such cases, the Court might consider intrinsic and

extrinsic evidence of the term's meaning.  Intrinsic evidence includes the patent claims, patent

specification and the prosecution history, while extrinsic evidence is everything else, including

---

[6]     Tag and Label Manufacturer's Institute, Inc., *Glossary of Terms for Pressure Sensitive Labels* (4th ed. 1992).

[7]     DuPont Films, *Teflon®/Tefzel® Films Price List and Ordering Guide* (1995).

[8]     Don Satas, *Handbook of Pressure Sensitive Adhesive Technology* (1982).

[9]     Michael Fairley, *Encyclopedia of Labels and Label Technology*.

[10]    Avery Dennison*, Pressure Sensitive Technology*.

[11]    J.M. Lantz, *ABS and Related Polymers*, *in Modern Plastics Encyclopedia* (1982-83).

[12]    Fasson, *Pressure-Sensitive Materials Selection Guide*.

[13]    *Webster's Third New Int'l Dictionary* (1986).

expert testimony, dictionaries, inventor testimony and learned treatises.  *Id*. at 1317.

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Id*. at 1314.  Claim terms must be evaluated in the context of the claim as a whole, and should be compared to similar terms in other claims.  Claims must also be read in light of the specification, which is the portion of the patent document that describes the invention in detail.  *Id*. at 1316.  At the same time, courts must avoid reading limitations from the specification into the claims.  *Id*. at 1323.  The Federal Circuit has recognized the tension between these two policies and counseled district courts "to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  *Id*.  Understood in this light, the prohibition on reading limitations from the specification into the claims is merely a recognition that a person of ordinary skill in the art would rarely limit a claim term to the specific embodiment disclosed in the specification.  *Id*.

Another piece of the intrinsic record is the prosecution history or file wrapper.  *Id*. at 1317.  The file wrapper is created during the prosecution of the patent before the PTO and may include the inventor's understanding of claim terms.  The inventor may also make arguments to distinguish a claim term from prior art or narrow a claim term to avoid prior art.   Nonetheless, the nature of the prosecution history as an ongoing negotiation rather than the completed product of that negotiation renders it less reliable than the specification.  *Id*.

The Court may also consider extrinsic evidence, although such evidence is less significant than intrinsic evidence.  *Id*.  Technical dictionaries, treatises and expert testimony may provide background in the art or establish the meaning of a patent term in a particular art.  *Id*. at 1318.  However, this evidence should be used to inform or confirm claim meaning, not to modify a meaning that is clearly established by the intrinsic record.  *Id*. at 1319.  Lay dictionaries

6

may also be useful, but may not trump an art-specific definition from the specification or technical sources. *Id*. at 1321-22.

The Federal Circuit does not require the above analysis to be performed in any particular sequence as long as each source is given the appropriate weight. *Id*. at 1324.

### DISCUSSION

**A.       The Person of Ordinary Skill in the Art**

Because the record must be viewed through the eyes of a person of ordinary skill in the art, the Court must first determine the characteristics of this hypothetical person. *See In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998) (explaining that the legal construct of a "hypothetical person having ordinary skill in the art" is "akin to the 'reasonable person' used as a reference in negligence determinations"); *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.,* 122 F.3d 1040, 1042 (Fed. Cir. 1997) ("The 'person of ordinary skill in the art' is a theoretical construct . . . , and is not descriptive of some particular individual."). Relevant considerations include "the educational level of the inventor; the type of problems encountered in the art; the prior art solutions to those problems; the rapidity with which innovations are made; the sophistication of the technology, and the educational level of workers in the field." *Helifix, Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1347 (Fed. Cir. 2000). "In a given case, every factor may not be present, and one or more factors may predominate." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

MPT argues that the relevant art is "container shipping and management" and that a person of ordinary skill in this art is "perhaps, a warehouse manager, a shipping manager, or someone of similar skill and background." In support, MPT notes that the patent claims a method of labeling reusable containers rather than the placard apparatus used in the method.

MPT posits that a person of ordinary skill in the art "would not necessarily be familiar with details of label construction and label film chemistry" but "would be familiar with the functions of typical commercially available labels and also the environment and needs of the container shipping business."

Defendants counter that the relevant art is "the labeling art" without clearly defining the level of ordinary skill in that art.  Defendants do provide ample evidence that labeling is a relevant field of the invention.  The inventor worked for 12 years for 3M Company in the sale of masking and film tapes and has sold labels for over twenty years while working for the company that manufactures MPT's label products.  (Petrou Dep. pp. 5-6).  Similarly, MPT is itself in the labeling business, not shipping.  (M. Kennedy Dep. p. 6).  The firm that prosecuted the patent considered it to be an invention in the "labeling area" and classified the invention as a "labeling system that permits relabeling of returnable containers."  (Barlow Dep. p. 16, 19; 7/13/92 Letter).  The prosecution history for the patents-in-issue repeatedly referred to label industry publications to define claim terms.  ('119 file, p. 75; '882 file, p. 47, 79; '202 file, p. 67).  Thus, a hypothetical person of ordinary skill in the art certainly has some knowledge of the label art and works in the label industry.

The next issue is the depth and breadth of that knowledge.  First, the inventor has a bachelor's degree in business administration and has been involved in sales throughout his time in the label industry.  (Petrou Dep. pp. 5-6).  Although there is no evidence of the educational level of other workers in the field, an experienced label salesman or sales engineer must understand how the products work and the terminology related to those products, but will not necessarily know the detailed engineering specifications of the products or how they are manufactured.  Second, the type of problems encountered in the art were attributable to the

8

characteristics of the commercially available label products in use at that time. For example, the invention allows the use of labels with "inexpensive permanent pressure sensitive adhesive coatings rather than more expensive removable coatings" by providing a placard that permits the easy removal of permanent labels. Third, the solution to the problem did not involve any innovation in label technology or chemistry. Instead, the inventor combined existing technologies to create his method. This implies strong familiarity with labels and their function, but not necessarily label chemistry or manufacture.

The Court therefore concludes that a person of ordinary skill in the art is "knowledgeable of the functions and terminology of typical commercially available labels and also the environment and needs of the container shipping business." This incorporates MPT's definition to a large degree but recognizes that the hypothetical person is not merely "familiar with" labeling. Moreover, such a person also has a strong understanding of label terminology. However, the hypothetical person is not a scientist or engineer in the label industry, and is not concerned with the manufacturing details of the commercial labels used in the method. This supports MPT's contention that the person of ordinary skill "would not necessarily be familiar with details of label construction and label film chemistry."

**B.     Claim Terms**

MPT accuses defendants of infringing Claims 1, 2, 3, 4 and 6 of the '790 patent and Claim 1 of the '164 patent. For the most part, the disputed terms are used in the same manner in each claim. Claim 1 and its dependent Claims 2 and 3 of the '790 patent are provided as examples below, with the disputed terms underlined:

1. A method of labeling and relabeling a reusable <u>container</u> comprising:

9

a) providing a <u>placard</u> for supporting pressure-sensitive adhesive- backed labels, said <u>placard</u> having a <u>release coated</u> face and an <u>adhesive coated</u> face, and a <u>liner</u> covering said <u>adhesive coating</u>;

b) removing said <u>liner</u> from said <u>adhesive coated</u> face;

c) substantially <u>permanently</u> attaching the <u>placard</u> to the <u>object</u> by adhering said <u>placard</u> to said <u>container</u> using said <u>adhesive coated</u> face;

d) placing a pressure-sensitive <u>adhesive coated</u> label on the <u>release coating</u> of said <u>placard</u> wherein said label has indicia printed thereon;

e) removing said label from the <u>placard</u> while leaving the <u>placard</u> adhered to the <u>container</u>, replacing said label with another <u>adhesive coated</u> label having different indicia printed thereon by adhering the <u>adhesive coating</u> of said another label to the <u>release coating</u> of the <u>placard</u>.

2. The method of claim 1 wherein the provided <u>placard</u> is <u>substantially transparent</u> and printing is applied to one of the faces under the <u>coating</u> of said one of the faces.

3. The method of claim 2 wherein the one face is the <u>adhesive coated</u> face.

Each of these terms is discussed below.  To the extent that Claims 1 through 3 of the '790 patent do not include a disputed term or a term is used in a different manner, the pertinent claim language will be cited in the following discussion.

> 1. <u>Release Coating and Release Coated</u>[14]

<u>Plaintiff's Proposed Construction:</u>    A "release coating" is a covering that permits the easy and complete removal of pressure sensitive adhesive labels.

<u>Defendants' Proposed Construction:</u>  A "release coating" is a material such as silicone or lacquer applied to a substrate by a liquid coating operation, which allows pressure

---

[14]     Defendants have asked the Court to define "release coated" as "a material having a 'release coating' which allows pressure sensitive labels to release."  MPT does not dispute this definition.  Because release coated is defined by reference to the definition of release coating, both terms will be addressed in this section.

10

sensitive labels to release.  The term does not encompass an uncoated film or the films of Riggsbee (U.S. Patent No. 4,767,654) or Du Katz (U.S. Patent No. 5,248,536) which Plaintiff told the Patent Examiner were not coated materials in order to induce the Patent Examiner to grant the patents-in-in suit nor does it include a laminate that is made by bonding two or more films together."

The Court's Claim Construction:      A "release coating" is a covering that permits the easy and complete removal of pressure sensitive adhesive labels.

"Release coated" means a material having a "release coating."

The parties do not dispute the function of a release coated surface.  They have not argued that MPT's proposed construction which "permits the easy and complete removal of pressure sensitive adhesive labels" differs in any appreciable manner from Defendants' proposed construction which "allows pressure sensitive labels to release."  Instead, the parties disagree over the materials that may perform this function.  Defendants are involved in the sale of a product that incorporates a Teflon® film to allow for the removal of pressure sensitive labels. Defendants argue that under their proposed definition, a Teflon® film could not literally infringe the patents because it is a film that is bonded to a second film, rather than a silicone or a lacquer applied to a substrate by a liquid coating operation.  MPT believes that any material that performs the release function and covers another material is release coated.

The release coating of the claims is on the release coated surface (or face) of the placard and allows for the placement and removal of adhesive coated labels.  For example, in Claim 1 of the '790 patent the "placard [has] a release coated face . . . ."  The method involves "placing a pressure-sensitive adhesive coated label on the release coating of the placard[,] . . . removing

11

said label from the placard" and "replacing said label with another adhesive coated label . . . ." The claims do not attempt to further define the release coating by its structure.  This claim language supports MPT's definition.  There is nothing in the claims to limit a release coating to a particular material or manufacturing process.  Instead, the focus is on the ability to permit the easy and complete removal of pressure sensitive adhesive labels.

Defendants counter that release coating has a special meaning in the art, and further, that the inventor meant to incorporate that meaning by his alternative use of "release layer" to describe the liner release surface in Claim 5 of the '790 patent and Claim 10 of the '164 patent. By using different terminology for the "release layer" of the liner and the "release coating" of the placard, Defendants believe the inventor was providing public notice that a placard with a release layer does not infringe.  Defendants then posit that a laminated film such as Teflon® is a release layer.

However, the claims do not disclose any structural difference between a "coating" and a "layer."  In fact, in the '164 patent the same liner release surface is described as both a "release coated" surface (Claims 3, 5 and 8) and a "release layer" (Claim 10).  MPT points out that Claim 1 and Claim 4 of the '790 patent describe the same adhesive face of the placard as "an adhesive coated face" and "a pressure sensitive placard adhesive layer," respectively.  Also, later in Claim 4 the adhesive surface of the label is described as "a pressure sensitive adhesive coating."  Thus, it appears from the claims that "coating" and "layer" are used interchangeably.

Both parties argue that the specification supports their position.[15]  Defendants argue that

---

[15]     The specifications for the '790 patent and the '164 patent are essentially the same.  For that reason, the Court will reference the '790 patent specification only.

12

the specification always describes the liner release surface as a "release layer" while the placard release surface only has a "release coating."  MPT counters in a number of ways.  First, Defendants are incorrect that the release surface of the liner is always referred to as a "release layer."  The "release layer **20**" of the liner is referred to as a "a release *coating* **20**"at one point in the specification.  ('790 patent, col. 2, ln. 20) (emphasis added).  Second, the "release coating" of the placard is referred to as a "layer" on a number of occasions.  For example, the specification describes the entire lamination, including the release coating of the placard, as "a multi-*layer* lamination **10**."  ('790 patent, col. 2, ln. 8-12) (emphasis added).  The patent drawings do not depict the placard release coating (element **24**) in a different manner than the liner release layer (element **20**).  Third, in the preferred embodiment both release surfaces are made of the same material: "The liner is provided with a silicone release layer **20**" and the placard release surface has "a silicone release coating **24**."  ('790 patent, col. 2, ln. 14-15, ln. 29-30).

Defendants explain the interchangeable use of "layer" and "coating" as follows: "The release layer may be either a 'release coating' [i.e., a lacquer or silicone applied by a liquid coating process] or it may be a film that has inherent release properties such as Teflon® film."  The Court disagrees.  Nothing in the claims or specification supports Defendants' position.  There is no indication that "coatings" are not "films" or even that "coating" is a subset of "layer."

Instead, the specification contemplates that a "layer" can be "laminated" to a "film" such that it "coats" the film.  Although the specification does not address the manufacturing process

13

for the placard release coating,[16] it does give an example of how the full lamination can be constructed from a commercially available liner and film.  In short, the paper liner **18** has a "*layer* of white modified acrylic adhesive **26** laminated to one side."  ('790 patent, col. 2, ln. 32-33) (emphasis added).  The film and liner are combined by "*laminating*" the "non-release coated side of the film" to the adhesive side of the liner, after which the adhesive surface initially referred to as a "layer" is referred to as providing an "adhesive *coated* surface."[17]  ('790 patent, col. 2, ln. 34-37 (emphasis added); *see also* '790 patent, col. 2, ln. 18-19 (describing an "opposite face [of the film] with a coating of adhesive **26**")).  This supports MPT's argument that a release coated surface may also be formed by the lamination of layers or films.

Moreover, assuming *arguendo* that "release coating" is a subset of "release layer," this does not mean that a release coating is "a material such as silicone or lacquer applied to a substrate by a liquid coating operation . . . [not] includ[ing] a laminate that is made by bonding two or more films together."  What is noticeably absent from the claims or specification is any indication that the terms "layer" and "coating" were intended to refer to materials produced by a particular manufacturing process.  Those terms simply describe the relationship between

---

[16]  MPT argues that "the placard acquires its 'release coated surface' through a process of laminating two solid webs together . . . ."  This is not correct.  The specification never describes how the release coated surface is applied to the film, beyond noting that a film already having a release coated surface is available from the Mobil Chemical Corporation.  ('790 patent, col. 2, ln. 28-31).

[17]  Defendants cite to *Satas* to explain the lamination process of the adhesive: "The adhesive is usually transfer coated.  That is, the adhesive is applied to the silicone coated sheet and transferred to the label stock in the final laminating step."  *Satas* at p. 398.  However, this reference merely confirms that a coating can be applied by a lamination process.

14

components of the full "multi-layer lamination **10**" used to perform the method.  For example, the "release coating **24**" is the outside "layer" of the lamination ('790 patent, col. 2, ln. 8-12), even though it is a "release coating **24**" for the placard film **22**.  ('790 patent, fig. 2; col. 2, ln. 23-24).  Similarly, the "release layer **20**"of the liner may generally be described as a layer located near the center of the lamination.  ('790 patent, fig. 2).  However, it is specifically referred to as "a release coating **20**" with respect to the "liner **18**" that it coats.

Defendants also focus on the fact that the release coating **24** coats a film **22**.  ('790 patent, col. 2, ln. 17-18, 29-30).  The film **22** has a "non-release coated side."  ('790 patent, col. 2, ln. 34-35).  Starting from the premise that the film **22** is not a release coating, Defendants conclude that no film can be used as a release coating.  This results in Defendant's proposed definition that a release coating cannot include "a laminate that is made by bonding two or more films together."  However, Defendants' logic is flawed.  A person of ordinary skill in the art would understand that the film **22** needs a release coating **24** not because it is a film, but because it is a film without release properties.

Defendants also point to the specification's specific reference to silicone as the release coating.  However, the claims never limit the release coating to silicone.[18]  Courts are not permitted to import the preferred embodiment into the claims unless it is justified by the claim language.  *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988).  The error would be particularly egregious here, since the patents' only references to a silicone release

---

[18]    Indeed, defendant Marathon Labels, Inc. responded to an interrogatory that "release coating" had a broad meaning that included materials other than silicone, but that "[t]he silicone release coating is the only enabling disclosure for the claimed feature."  (Marathon's Resp. to Pl's 1st Req., Interr. # 8).

coating are in the description of the preferred embodiment.  *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1369 (Fed. Cir. 2004).  The claims and the remainder of the specification recite a generic release coating.  By leaving silicone out of the claims, the inventor chose not to limit his invention to a silicone release coating.  *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (explaining that "there is nothing in the asserted claims themselves about" the preferred embodiment).

These conclusions are confirmed by reading the patent specification in light of its purpose to "teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  *Phillips*, 415 F.3d at 1323.  As is demonstrated by the extrinsic evidence discussed below, although numerous materials have release properties, the most common material for this application at the time of the invention was silicone.  It makes sense that the inventor would use silicone in the "Description of the Preferred Embodiment" section of the patent to teach and enable others to perform the inventive method.  Moreover, the inventor risks invalidity if he fails to "set forth the best mode contemplated by the inventor of carrying out his invention."  35 U.S.C. § 112.  It certainly appears that the inventor's contemplated best mode included a silicone release coating.

It is also important to consider exactly what the specification would teach a person of ordinary skill in the art.  As is confirmed by the technical references discussed below, silicone is immediately recognizable as a material that permits the easy and complete removal of pressure sensitive adhesive labels .  There is no indication anywhere in the specification that silicone is being used to explain the manufacturing process or original physical state of the release coating.  Instead, the specification assumes that materials with appropriate release properties are

16

commercially available from others.  In sum, it is clear that the references to silicone were intended to teach and disclose the best mode for the invention rather than to limit the scope of the claims.  *Phillips,* 415 F.3d at 1323.

The Court turns next to the prosecution history.  The parties focus on two patents that were discussed during prosecution, *Riggsbee* and *Du Katz.  Riggsbee* discloses an improved detachable coupon label.  Prior to *Riggsbee's* invention, it was widely believed "that an effective detachable coupon label had to employ an adhesive to ensure that the coupon or label did not prematurely detach from the carton or container."  (*Riggsbee*, col. 2, ln. 31-34).  Other label structures required "a release polymer" to allow for the easy removal of labels.  (*Riggsbee*, col. 2, ln. 38-41).

*Riggsbee* recognized a need for "a coupon label that will securely adhere to packaging *without the use of an undesirable tacky adhesive* and which can be readily removed *without the use of a release substance*."  (*Riggsbee*, col. 2, ln. 42-45) (emphasis added).  *Riggsbee* accomplished this goal by applying a resin film to the label base sheet to form a composite web.  (*Riggsbee*, col. 4, ln. 15-19).  This process created the necessary London or dispersion force between the resin film and the base sheet such that the label would separate from the film only upon the application of a desired release force.  (*Riggsbee*, col. 4, ln. 15-19).  London or dispersion force is a force of attraction between two materials that does not require an adhesive.  (*Riggsbee*, col. 4, ln. 20-25).  *Riggsbee* goes on to describe in detail some examples of materials and the manufacturing process used to produce labels with the necessary London or dispersion force.

The examiner initially rejected the claims of the original '119 application in light of

*Riggsbee*.  The prosecuting attorney responded with two arguments, the first addressed the

method of relabeling and the second the film material.  First, "Riggsbee is designed for one-time

use" and "[n]o relabeling with a different label is disclosed."  ('119 file, p. 40) (emphasis in

original).  Second, "once the coupon [i.e., the label of *Riggsbee*] is removed [from the film of

*Riggsbee*], there is no release-coated face exposed for receiving another label.  The coupon itself

has no adhesive coating on it so it cannot be adhered to the film." ('119 file, p. 40).

It is not entirely clear why the examiner eventually rescinded the rejection under

*Riggsbee*.[19]  ('119 file, p. 67).  In any event, the '119 application was abandoned in favor of the

'882 continuation-in-part application, which added the following material to the specification:

> A label is applied to the placard outer face such that a pressure sensitive adhesive
> backing of the label is releasably attached to the release coated surface even if the
> label has a so called permanent adhesive backing.

*          *          *

> Moreover, because of the release coating **24** any commercially available label can
> be used including those with inexpensive permanent pressure sensitive adhesive
> coatings rather than more expensive removable coatings.

(*Compare* '882 file, p. 6, *with* '119 file, pp. 9-10)

Among other rejections, the '882 claims were rejected under 35 U.S.C. § 102(e) as

anticipated by *Du Katz* and 35 U.S.C. § 103 as obvious under *Du Katz* in light of *Riggsbee*.

Regarding *Rigsbee*, a declaration of Michael Kennedy stated as follows:

---

[19]     Following the applicant's filing of an appeal brief, and before an
appeal, the examiner ended the *Riggsbee* line of rejections with the
following terse statement: "The Final rejection dated November
10, 1993 has been rescinded[.]" ('119 file, p. 67).  This provides
some anecdotal support to the Federal Circuit's warnings about the
lack of clarity often present in patent prosecution histories.
*Phillips*, 415 F.3d at 1317.

18

> I have reviewed Rigsbee Patent 4,767,654 and failed to see where it in any way
> suggests the use of a release coating to enable a user to utilize labels with either
> permanent or reusable adhesive and be able to remove such a label without
> damage to the substrate.  Indeed, this patent teaches the use of a casting substrate
> to avoid "an undesirable tacky residue" when a coupon is removed.

('882 file, p. 8).[20]

*Du Katz* describes an apparatus for displaying removable indicia in a setting such as a fast food restaurant.  (*Du Katz*, col. 4, ln. 21-27).  A base sheet is manufactured of ABS or other commercially available materials.  (*Du Katz*, col. 4, ln. 47-66).  The base sheet displays information such as combo meals with predetermined non-printed zones.  (*Du Katz*, col. 4, ln. 67 - col. 5, ln. 20).  The non-printed zones of the base sheet receive removable indicia which include information such as the price of the combo meal and can be changed without replacing the entire display.  (*Du Katz*, col. 5, ln. 21-67).  The removable indicia (i.e., the *Du Katz* component which is similar to a label) "may have a removable adhesive deposited thereon, such as, for example, the water-base adhesive KIWO®" for attachment to the base sheet.  (*Du Katz*, col. 5, ln. 35-37).  A substantially transparent cover sheet "is conformably dimensioned to mate with the base sheet **20**, and is operable to selectively locate and substantially seal the removably interchangeable indicia **30** within the apparatus **10** for view by the consumer."  (*Du Katz*, col. 7, ln. 20-24).

The declaration of Michael Kennedy was submitted in response to this rejection.  ('882 file, p. 48).  He referred the patent examiner to definitions for permanent adhesive and removable adhesive provided by the Fasson company:

---

[20]     This declaration was also submitted with the '202 application.
        ('202 file, p. 68).

19

*Permanent*:    An adhesive designed to stick to a substrate without edge lifting that cannot be removed without damaging either the label or the substrate.

*Removable:*    An adhesive designed to stick to a substrate without edge lifting that can be removed without damage to either the label or the substrate.

('882 file, p. 51).

He then argued that the surface of *Du Katz* could release only removable adhesive labels, and thus did not have a release coating:

The ABS "base sheet" 20 of [*Du Katz*] is printed on its outer surface and does not have a release coating.  The removable labels 30 must necessarily have a removable adhesive.  Otherwise the outer surface of the "base sheet" 20 could be damaged when the "indicia" 30 are removed and replaced.  Any printing that might underlie the labels could be stripped away.

('882 file, p. 48).[21]

Kennedy also submitted evidence that the invention enjoyed commercial success.  The examiner ultimately found this latter basis persuasive, relying on "the weight of evidence relating to long felt need and commercial success . . . to overcome the prima facie case for obviousness that had existed against the claims in this case."[22]  ('882 file, p. 92).  That application then issued as the '790 patent.

---

[21]    These statements are repeated elsewhere in the '882 application and also in the '202 application.  ('882 file, p. 8; '202 file, p. 68).

[22]    A prima facie case of obviousness is a procedural tool used by the PTO.  *In re Oetiker*, 977 F.2d 1444, 1445 (Fed. Cir. 1992).  The patent examiner has the initial burden of setting forth a prima facie case of obviousness.  *Id.*  This may be overcome by objective evidence of nonobviousness such as commercial success and long felt need.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Rouffet*, 149 F.3d at 1355.

20

The '882 application was also continued as the '202 application.  The '202 application was initially rejected as obvious under *Du Katz* and two other patents.[23]  ('202 file, p. 36).  The arguments made above were largely repeated during prosecution of the '202 application.  (*E.g.*, '202 file, p. 68).  The claims were eventually allowed on the basis that the "prior art fails to teach a placard having a release coating."  ('202 file, p. 79).  The '202 application issued as a patent and was reissued as the '164 patent.

Defendants essentially repeat their film/release coating argument with respect to the prosecution history.  The argument goes as follows: 1) *Riggsbee* and *Du Katz* are films (or layers); 2) *Rigsbee* and *Du Katz* are not release coatings; and 3) therefore, no film can be a release coating.  Defendants' argument is flawed.  The prosecution history clearly indicates that, to the extent *Rigsbee* and *Du Katz* were distinguished based on their materials, the critical distinction was the materials' lack of release properties to accommodate both permanent and removable pressure sensitive adhesive labels.  *Riggsbee* teaches away from using any release substance or adhesive labels, while *Du Katz* only allows for the use of removable adhesive labels.  That the materials of *Rigsbee* and *Du Katz* might have been referred to as films was wholly irrelevant.[24]

---

[23]    *Riggsbee* was not cited in the initial rejection of the '202 application.  ('202 file, p. 42).

[24]    Indeed, *Riggsbee* describes a prior art patent where a "film is . . . *coated* onto the release polymer."  (*Riggsbee*, col. 2, ln. 12-13) (emphasis added).  *Du Katz* was not concerned with the nature of the base sheet as a film.  The base sheet or main body can be made of numerous materials which might not be characterized as a film, such as "styrene, vinyl, paper, polyester, foam stock or polycarbonate, to name a few."  (*Du Katz*, col. 4, ln. 64-66).  ABS itself is not necessarily a film.  (*See Lantz*).

Defendants also wish the Court to include in the definition of release coating the following statement: "The term does not encompass . . . the films of Riggsbee (U.S. Patent No. 4,767,654) or Du Katz (U.S. Patent No. 5,248,536) which Plaintiff told the Patent Examiner were not coated materials in order to induce the Patent Examiner to grant the patents-in-suit . . . ." Their request is denied for a number of reasons. First, Defendants' statement focuses on the incorrect "films are not coatings" argument. The applicant certainly made limiting statements with respect to *Riggsbee* and *Du Katz*, but again, those statements were focused on the function of the release coating as permitting the easy and complete removal of pressure sensitive adhesive labels, something that the Court has already included in its claim definition. Second, Defendants' definition is unwieldy and inappropriate for presentation before a jury. The Court can define release coating in a concise and understandable manner that does not require reference to other patents and create the potential for a backdoor around this *Markman* ruling. Third, if Defendants are seeking to make a prosecution history estoppel argument, that limitation on the doctrine of equivalents is more appropriately addressed to the Court after the claim term has been defined.

The prosecution history instead confirms the Court's reading of the claims and specification. As was discussed above, there is no indication in the prosecution history that a film cannot be a release coating. Nor is there any indication in the cited passages that the release coating is limited to "a material such as silicone or lacquer applied to a substrate by a liquid coating operation." Similar to the specification and claims, the prosecution history focuses on the functionality of the release coating. Specification language was added stating that labels with "permanent pressure sensitive adhesive coatings" could be released from the release coating

22

and both *Du Katz* and *Riggsbee* were distinguished on this basis.

Finally, the extrinsic evidence also supports the Court's conclusion.  The following industry definitions were provided by Defendant:

- "**RELEASE COAT**  The release liner treatment material that allows pressure sensitive labels to release from the release liner.  Usually made from silicone."  (*TLM* p. 49).

- "**Release Coat** (release lacquer, lacquer, silicone coat) Material coated on the liner which allows [pressure sensitive] labels to release."  (*Fasson* p. 35).

- "**Release coating –** The release liner treatment material – usually silicone – that is coated onto the backing paper or film and which enables pressure-sensitive face materials or labels to be readily removed from the protective release liner prior to application.  *See silicone release coatings*."  (*Fairley* p. 167).

- "Release layer.  A thin layer of chemicals, usually silicones, which 'release' the adhesive from the liner.  This layer is sometimes referred to as the silicone or lacquer layer."  (*Avery* § 4 p.1).

Despite Defendants' arguments to the contrary, these industry definitions are consistent with the Court's reading of the intrinsic record.  All four define the release coat or release layer by reference to its function of allowing for the release of adhesive surfaces.  As is indicated by the qualifying language that the release coat is "usually" made from silicone or lacquer, the examples are not intended to exclude other materials with the same properties.  In fact, the citation of silicone as an exemplary material supports the Court's conclusion that the patent specification's recitation of a "silicone release coating" in the preferred embodiment would be recognized by a person of ordinary skill in the art as describing release properties rather than a manufacturing process.

These definitions provide no support for limiting a coating to a material "applied to a substrate by a liquid coating operation" as Defendants suggest.  The definitions say nothing about a liquid coating operation.  Nonetheless, Defendants' argue as follows: 1) a release coating

23

must be silicon or lacquer; 2) silicone and lacquer are applied by a liquid coating operation; and

3) therefore, a release coating must be applied by a liquid coating operation.  Defendants are

wrong on all three counts.  As was stated above, silicone and lacquer are merely provided as

examples of a release coating.  Moreover, Defendants have not pointed the Court to any

evidence that silicone or lacquer must be applied by a liquid coating operation.  Thus, the

technical definitions provide no support for Defendants' proposed limitation.[25]

Defendants next point to a definition of a "laminate" as "[a] web material formed by

bonding two or more materials together as in a pressure sensitive construction.  To apply one

layer of material over another."  (*TLM* p. 32).  Defendants apparently believe that the inclusion

of this definition in the same glossary necessarily means that "coating and lamination are two

different processes."  However, the *TLM* glossary defines a release coating by its properties, not

by a manufacturing process.  A laminate, by contrast, is defined by its method of manufacture.  It

is entirely consistent for a product produced as a laminate to have the properties of a release

---

[25]      Defendants also provide the following definition:

> **COATING** In printing, an emulsion, varnish or lacquer applied in-line or off-line, often over a printed surface to give it added protection.

> (*TLM* p. 12).  This does not support limitation of a coating to a liquid coating process.  First, the definition requires the same logical leap as every other definition proffered by defendants; namely, the Court must assume that the enumerated substances may only be applied as a liquid.  Second, this definition is explicitly limited to printing.  A brief review of a few pages of the *TLM* glossary indicates that there are many types of coatings, such as "clear coat," "clay coat," "barrier coat," "sealer coat" and "anchor coat."  None of these coatings appear to be limited to a liquid coating process, and if one had been, the Court assumes that Defendants would have pointed this out.

coating.[26]

Defendants also note a definition of "release liner" as "[t]he component of the pressure sensitive label stock which functions as a carrier for the pressure sensitive label.  Prior to application, it protects the adhesive, and readily separates from the label immediately before the label is applied to product."  (*TLM* p. 50).  Defendants posit, without explanation, that this means that a release coating is merely a subset of materials with release properties.  A careful review of the definitions reveals the opposite.  The *TLM* release liner definition refers to a unitary component of the label stock that is made up of both the release coating and the material it coats.  (*See TLM* p. 49 (defining a release coating as a release liner treatment material)).  The release coating is what allows the release liner to release.

Defendants other arguments are similarly flawed.[27]  The extrinsic evidence only supports

---

[26]    The only definition relating to a "coating" process, provided by MPT, confirms this conclusion:

> **Coating** - A thin polymeric *layer* applied to the surface of a film to provide enhanced surface characteristics.

(*Ampef* p. 1).  Although this definition is not entitled to great weight since it postdates the patent application by a number of years, it is notable in that it is the only generic technical definition of coating provided by either party.

MPT also notes that it manufactured a placard from a material called *Tefzel*, which it believes is similar to *Teflon*.  (*See Tefzel*).  Although the inventor testified that "he didn't consider [the *Tefzel* lamination] any different from our regular one" (Petrou Dep. pp. 46-50), MPT has provided no evidence for its assertion that "[t]he Kennedy Group placed notification of the '790 patent on the *Tefzel*-coated placard."

[27]    Defendants' argument that MPT's definition would not be enabled is an invalidity argument.  Defendants' reference to a later

25

the definition dictated by the intrinsic record.

The final issue is the use of the term "covering" in the Court's definition.  The claims, specification, prosecution history and technical definitions all define release coating by reference to its release function rather than the fact that it is a coating.  Throughout these materials, the term coating was used according to its plain meaning as a material that covers another material.  Although Defendants are correct that lay dictionary definitions cannot trump an art-specific meaning from the claims, specification, prosecution history or technical literature, all of those sources use the term coating in a manner consistent with the dictionary definition as a covering.  (*E.g., Websters* p. 433) (defining "coating" as "a layer of any substance used as cover, protection, decoration or finish").

Accordingly, the Court construes "release coating" as  "a covering that permits the easy and complete removal of pressure sensitive adhesive labels."  "Release coated" is construed as "a material having a 'release coating.'"[28]

2.    <u>Release Layer</u>

------

Kennedy application is similarly irrelevant.  First, the application was filed well after the original application and has little bearing on how a person of ordinary skill in the art would understand that application at the time the application was filed.  Second, the application states that "[t]he release surface 23 may be a coating applied to the protective layer 22 or may be a property of the material from which the protective layer is made."  This passage merely recognizes that some materials may operate as both a "protective layer" and as a "release surface."  There is nothing to indicate that a protective layer with release properties could not be used as a release coating in another application.

[28]    In light of the Court's definition of "release coating," Defendants proposed definition of release coated as "a material having a 'release coating' which allows pressure sensitive labels to release" is redundant.

26

<u>Plaintiff's Proposed Construction:</u>     Identical to "Release Coating."

<u>Defendants' Proposed Construction:</u>  A "release layer" is a layer on the "liner" that

allows for the release of the liner from the adhesive on the back of the placard so

that the placard may be adhered to the container.  The release layer may be either

a "release coating" as defined above or it may be a film that has inherent release

properties such as Teflon® film.

<u>The Court's Claim Construction:</u>     The claim term will not be construed because the

claims in which it appears are not at issue.

The term "release layer" only appears in Claim 5 of the '790 patent and Claim 10 of the

'164 patent.  MPT does not argue that Defendants infringe either of these claims.  The Court will

not construe a claim term that is not at issue.

> 3.     <u>Adhesive Coating</u>

<u>Defendants' Proposed Construction:</u>  An "adhesive coating" is a substance such as a glue

or gum, which is applied by "coating," which is capable of holding materials

together by surface attachment.  It does not include magnetic materials that affix a

label to a metal surface.

<u>Plaintiff's Proposed Construction:</u>     Leave undefined.

<u>The Court's Claim Construction:</u>     An "adhesive coating" is a covering of a substance

such as a glue or gum, which is capable of holding materials together by surface

attachment.  It does not include magnetic materials that affix a label to a metal

surface.

MPT believes that adhesive coating is a term that a jury can understand without further

27

definition.[29]  In any event, MPT does not state any disagreement with the portion Defendants'

definition which refers to "a substance such as a glue or gum . . . which is capable of holding

materials together by surface attachment.  It does not include magnetic materials that affix a

label to a metal surface."  The Court finds that this portion of Defendants' definition is not

contrary to the plain meaning and is consistent with industry definitions.[30]  For example, one

industry reference defines adhesive as follows:

> **Adhesive** (glue, gum) - A substance capable of holding materials together by
> surface attachment.  (American Society for Testing Materials).

(*Fasson* p. 31).

However, MPT does not agree that the adhesive must be applied by "coating" as that

term is defined by Defendants.  The same arguments that apply to a release coating apply with

equal force here.  Simply put, none of the evidence provided by Defendants supports limiting a

coating to a material applied by a liquid coating process.  As was discussed in detail above, the

specification explicitly contemplates that an adhesive coating can be applied to the placard by a

---

[29]     MPT also explains that it was not notified of Defendants' position
on "adhesive coating" until right before the deadline for initial
*Markman* briefs.  However, MPT has had an opportunity to
respond to Defendants' position.

[30]     Although the Court might otherwise be wary of including
examples ("a substance such as a glue or gum") or express
disclaimers of claim scope ("It does not include magnetic materials
that affix a label to a metal surface") within a claim definition,
MPT has provided no argument that the Court should not do so.
Moreover, these portions of Defendants' definition do not appear
to be contrary to portions of the claims, specification, prosecution
history or extrinsic evidence identified for the Court .  This is quite
different from the definition of a release coating, where the
examples and express disclaimers Defendants sought to import
into the claim definition were contrary to the intrinsic and extrinsic
record.

28

lamination process involving an adhesive layer.

Defendants nonetheless argue that an adhesive coating cannot be defined as a covering. First, they note that Claim 1 includes "a liner covering said adhesive coating."  From this they conclude that the adhesive coating cannot be a covering, since this would mean there is a covering for a covering.  The Court has no difficulty with a covering having a covering.  The adhesive coating of Claim 1 is defined as the "adhesive coated face" of a placard.  There is no reason that the adhesive cannot serve as a covering for a placard while a liner covers the adhesive.[31]

> 4.      Coating (Claim 2 of the '790 patent)

Defendants' Proposed Construction:  A "coating" is either the "release coating" or the
>    "adhesive coating" referred to in claim 1.

Plaintiff's Proposed Construction:     Leave undefined.

The Court's Claim Construction (Claim 2 Only):     The "coating" of Claim 2 of the '790
>    patent  is either the "release coating" or the "adhesive coating" referred to in
>    Claim 1 of the '790 patent.

Of the claims being asserted, the unmodified term "coating" appears only in Claim 2 of the '790 patent.  Claim 2 is dependent on Claim 1 and claims "printing . . . applied to one of the faces [of the placard] under the coating of said one of the faces."  The faces of the placard are defined in Claim 1 as "a release coated face and an adhesive coated face . . . ."  Defendants' definition correctly describes the scope of "coating" as applied to Claim 2.

---

[31]      The same logic applies to the specification's description of "a
disposable liner having a release coating on one face for covering
the placard's adhesive coating."  ('709 patent, col. 1, ln. 56-57).

5.      Placard

Plaintiff's Proposed Construction:     A "placard" is a card used to support the display of

information.

Defendants' Proposed Construction:  A "placard" is a structure adapted for supporting a

pressure sensitive adhesive backed label where the structure has two faces, a

"release coated" face and a face with an adhesive coating.

The Court's Claim Construction:     A "placard" is a structure adapted for supporting a

pressure sensitive adhesive backed label.

Although MPT would prefer to leave the term placard undefined, it does not disagree

with the portion of Defendants' definition that describes "a structure adapted for supporting a

pressure sensitive adhesive backed label . . . ."  However, MPT does take issue with the

remainder of the definition.  It argues that the coatings of the placard faces are defined within

each claim, and therefore should not be included in a generic definition of the term placard.

The Court agrees.  For example, Claim 1 of the '790 patent describes a "placard having a

release coated face and an adhesive coated face" while Claim 6 of the '790 patent and Claim 1 of

the '164 patent describe a "placard . . . with a release coated surface of the placard oriented

outwardly" without reference to an adhesive coated face.  Because the placard face coatings are

further defined within each claim, the Court defines the generic placard as "a structure adapted

for supporting a pressure sensitive adhesive backed label."

6.      Liner

Defendants' Proposed Construction:  A "liner" is a paper or plastic web which has a

"release layer" that is in contact with a pressure sensitive adhesive.

30

<u>Plaintiff's Proposed Construction:</u>     Leave undefined.

<u>The Court's Claim Construction:</u>  A "liner" is a material which has a layer that allows for

the release of the liner from the adhesive on the back of the placard and is in

contact with a pressure sensitive adhesive.

Defendants point first to the patent.  Claim 1 refers to a liner that covers the adhesive

coating of the placard and is removed from an adhesive coated face.  The specification describes

a liner preferably made of paper with a release layer.  ('790 patent, col. 2, ln. 13-15).  The liner is

removed to expose the adhesive coated face which is then used to apply the placard to a

container.  ('790 patent, col. 1, ln. 55-58; col. 2, ln. 46-49).

Defendants' definition incorporates its earlier definition for "release layer."  Because the

Court did not adopt a definition for "release layer," it is necessary to consider Defendants'

definition here:

> A "release layer" is a layer on the 'liner' that allows for the release of the liner
> from the adhesive on the back of the placard so that the placard may be adhered to
> the container.  The release layer may be either a 'release coating' as defined
> above or it may be a film that has inherent release properties such as Teflon®
> film.

As was discussed in detail above, the Court does not accept Defendants' attempt to

distinguish a coating from a film.  However, the first half of Defendants' definition of release

layer is not inconsistent with the claims and the specification.  Combining the two definitions

results in the following:

> A "liner" is a paper or plastic web which has a layer that allows for the release of
> the liner from the adhesive on the back of the placard and is in contact with a
> pressure sensitive adhesive.

MPT simply wants the Court to leave "liner" undefined.  MPT's only argument is that

liner has no special meaning in the art and should therefore be left for the jury to ascertain its

plain English meaning.  Defendants counter with a number of definitions from technical

references:

- "**RELEASE LINER** The component of the pressure sensitive label stock which functions as a carrier for the pressure sensitive label.  Prior to application, it protects the adhesive, and readily separates from the label immediately before the label is applied." (*TLM* p. 50).

- "**Release Liner** (backing, backing paper, carrier, liner) The component of the [pressure sensitive] laminate which functions as the carrier for the label.  It protects the adhesive prior to application, and it readily separates from the label immediately before the label is applied to the substrate."  (*Fasson* p. 35).

Industry sources and an MPT representative agree that these definitions accurately

represent the industry definition of a release liner.  (T. Kennedy Dep. p. 63-64; Macuga Dep. p.

16-17).  In light of MPT's refusal to provide any evidence or argument from any source to the

contrary, the Court agrees.  A person of ordinary skill in the art would recognize that a liner has

a layer that is in contact with an adhesive and allows for the release of the liner from the

adhesive.  However, none of these definitions require the "paper or plastic web" of Defendants'

definition.  Therefore, the Court construes a "liner" as "a material which has a layer that allows

for the release of the liner from the adhesive on the back of the placard and is in contact with a

pressure sensitive adhesive."

7.    (Substantially) Transparent

Defendants' Proposed Construction:  "Substantially transparent" means transmitting light

without appreciable scattering in a manner such as ordinary window glass so that

objects placed behind the placard are clearly distinguishable.

Plaintiff's Proposed Construction:    Leave undefined.

<u>The Court's Claim Construction For Transparent:</u>  "Transparent" means transmitting light without appreciable scattering in a manner such as ordinary window glass so that objects placed behind the placard are clearly distinguishable.

Claim 2 states as follows:

**2**. The method of claim 1 wherein the provided placard is <u>substantially transparent</u> and printing is applied to one of the faces under the coating of said one of the faces.

MPT argues that "transparent" should not be defined because its common English meaning is clear.  The problem with this argument is that the industry definitions provided by Defendants and incorporated into Defendants' proposed construction are entirely consistent with the Court's understanding of the common English meaning of transparent.  The technical references state as follows:

• "**TRANSPARENT**  Transmitting light without appreciable scattering so that objects beyond are clearly distinguishable."  (*TLM* p. 63).

• "**TRANSPARENT LABEL**  A pressure sensitive label whose face material, adhesive and protective coatings, transmit light so that objects can be seen through it."  (*TLM* p. 63).

• "**Transparent** - The ability of a material to transmit light without any appreciable scattering.  Objects viewed through transparent materials are clearly distinguishable and are therefore also described as 'clear' or 'glass clear'" (*Fairley* p. 214).

• "**Transparent label** - Pressure-sensitive label in which the face material, adhesive and any protective coating transmit light and through which objects can be clearly seen.  A transparent label on a clear bottle will allow the color, nature and volume of the contents of a bottle to be viewed through the label.  *See also 'No-label look'.*"  (*Fairley* p. 215).

Transparent has a well established meaning in the art and a person of ordinary skill in the art would recognize that meaning in the language of Claim 2.  However, the Court recognizes that Claim 2 describes a *substantially* transparent placard.  Neither party has attempted to explain to the Court how a substantially transparent placard differs from a transparent placard.  Thus, the

Court adopts Defendants' definition, but only for the term "transparent."

        8.     <u>First Product Set, Second Product Set, First Contents Set, Second</u>

             <u>Contents Set</u>

<u>Defendants' Proposed Construction:</u>  Each of the above is "a term that was not used in the original application, is not defined in the patent specification, is not used in the label art, and is vague and indefinite."

<u>Plaintiff's Proposed Construction:</u>    These terms mean "a collection of items."

<u>The Court's Claim Construction:</u>    None.

"First product set" and "second product set" only appear in Claim 6 of the '790 patent. "First contents set" and "second contents set" only appear in the '164 patent (including Claim 1). Defendants seek the premature adjudication of the validity of these claims under 35 U.S.C. § 112 rather than claim construction.  MPT's only support for its position is a description of a prior art label.  ('790 patent, col. 1, ln. 22-25).  MPT's argument is not persuasive and § 112 validity issues are not ripe.  Therefore, the Court declines to render a construction of first product set, second product set, first contents set, and second contents set.

        9.     <u>Container</u>

<u>Defendants' Proposed Construction:</u>  A "container" is a receptacle for holding items.

<u>Plaintiff's Proposed Construction:</u>    Leave undefined.

<u>The Court's Claim Construction:</u>    A "container" is a receptacle for holding items.

MPT does not dispute Defendants' definition of container.  Instead, it claims that it would confuse the jury to provide a definition for this non-technical term.  However, the Court perceives no harm in providing this definition to the jury and adopts Defendants' definition.

10.    Object

Defendants' Proposed Construction:  An "object" is any article having three dimensions.

Plaintiff's Proposed Construction:    Leave undefined.

The Court's Claim Construction:        An "object" is any article having three dimensions.

MPT does not dispute Defendants' definition of object.  Instead, it claims that it would confuse the jury to provide a definition for this non-technical term.  However, the Court perceives no harm in providing this definition to the jury and adopts Defendants' definition.

11.    Permanently

Defendants' Proposed Construction:  "Permanently" means affixed to an "object" or

"container" such that a placard permanently attached or affixed to the substrate

cannot be removed without damaging the placard or the "object" or "container."

Plaintiff's Proposed Construction:    "Permanently" means capable of continuing or

enduring through multiple cycles of labeling and relabeling of the container.

The Court's Claim Construction:        "Permanently" means affixed to an "object" or

"container" such that a placard permanently attached or affixed to the substrate

cannot be removed without damaging the placard or the "object" or "container."

Defendants first note that all of the claims at issue involve "substantially permanently attaching" or "substantially permanently affixing" a placard to a container or an object, yet none of those claims mention the removal of the placard after it is attached or affixed.  Similarly, the patent specification does not discuss the possibility of removing the placard once it has been attached to a the container.  This supports Defendants' definition of permanently.

MPT counters that there is no reason that removal of a placard from a container must

35

cause damage to one of these items.  MPT draws support for its definition from the patent specification, which generally describes multiple applications of pressure sensitive adhesive labels on the release coated face of the placard.  ('790 patent, col. 1, ln. 49–54, col. 2, ln. 47-57).  The implication is that the only requirement for a permanently attached placard is that it is attached in a manner that allows for the repeated application of labels.  MPT also draws support from a lay dictionary definition of permanent as "continuing or enduring (as in the same state, status, place) without fundamental or marked change . . . ."

Defendants also rely on the specification.  One of the advantages of the invention is the ability to release a label even if it has a "so called permanent adhesive backing" such that "inexpensive permanent pressure sensitive adhesive coatings rather than more expensive removable coatings" may be used.  ('790 patent, col. 1, ln. 52-3, col. 2, ln. 65-68).  During prosecution, a permanent adhesive was described as follows:

> *Permanent*:  An adhesive designed to stick to a substrate without edge lifting that cannot be removed without damaging either the label or the substrate.
>
> *Removable:*  An adhesive designed to stick to a substrate without edge lifting that can be removed without damage to either the label or the substrate.

('882 file, p. 51).

If permanent means something that "cannot be removed without damaging either the label or the substrate," it follows that a permanently attached placard could not be removed without damaging the placard or the container.  Industry publications provide the following definitions:

- "**PERMANENCY**  A measure of an adhesive's ultimate holding power or bond strength.  A permanent adhesive will develop a bond that makes label removal difficult or

impossible without distorting the face stock."  (*TLM* p. 43).

• "**PERMANENT ADHESIVE** An adhesive characterized by having relatively high ultimate adhesion to a wide variety of surfaces."  (*TLM* p. 43).

• "A label is considered permanent if the bond to the substrate makes removal difficult or impossible without distorting the facestock or damaging the substrate." (*Fasson* p. 6).

MPT does not dispute these definitions.  Instead, it argues that they are inapplicable, since the specification's reference to a permanent adhesive was with respect to the labels, not the placard.  Although the Court recognizes the distinction, it does not support a different definition in the claims.  For example, Claim 1 of the '790 patent describes the process of "substantially permanently attaching the placard to the object . . . *using said adhesive coated face* [of the placard] . . . ."  There is no indication that an adhesive used to "permanently attach" the placard to the container would be any different than the permanent adhesive of a label.  Therefore, the Court adopts the definition of "permanently" proposed by Defendants.[32]

**CONCLUSION**

Having considered the parties' arguments, the Court construes the disputed claim terms as follows:

A "release coating" is a covering that permits the easy and complete removal of pressure sensitive adhesive labels.

A "release coated" surface is a material having a "release coating."

---

[32]    Claim 6 of the '790 patent and Claim 1 of the '164 patent do not recite a placard adhesive face.  However, MPT has made no argument that these claims should be treated differently with respect to their use of the term permanently.  Because MPT has applied the same definition to all instances of permanently, and Claims 1 and 4 must adopt the definition supplied by Defendants, the Court applies this definition to all instances of permanently.

"Release layer" will not be construed because the claims in which it appears are not at issue.

An "adhesive coating" is a covering of a substance such as a glue or gum, which is capable of holding materials together by surface attachment.  It does not include magnetic materials that affix a label to a metal surface.

The "coating" of Claim 2 of the'790 patent is either the "release coating" or the "adhesive coating" referred to in Claim 1 of the '790 patent.

A "placard" is a structure adapted for supporting a pressure sensitive adhesive backed label.

A "liner" is a material which has a layer that allows for the release of the liner from the adhesive on the back of the placard and is in contact with a pressure sensitive adhesive.

"Transparent" means transmitting light without appreciable scattering in a manner such as ordinary window glass so that objects placed behind the placard are clearly distinguishable.

A "container" is a receptacle for holding items.

An "object" is any article having three dimensions.

"Permanently" means affixed to an "object" or "container" such that a placard permanently attached or affixed to the substrate cannot be removed without damaging the placard or the "object" or "container."


IT IS SO ORDERED.

38

 /s/ Patricia A. Gaughan 

PATRICIA A. GAUGHAN
United States District Judge

Dated:   2/7/06