**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MPT, Inc.** | ) | **CASE NO. 1:04 CV 2357** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **Marathon Labels, Inc.,** | ) | |
| **Marathon Durable Labeling** | ) | **Memorandum of Opinion and Order** |
| **Systems LLC, and** | ) | |
| **Polymeric Converting, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendant, Polymeric's, Motion to Compel Production of Documents Previously Requested Under Subpoena Duces Tecum from the Kennedy Group (Doc. 97) and the Motion to Compel of Defendant Polymeric Seeking Disclosure of Documents and Things Pursuant to Fed. R. Civ. P. 34 and 37(a) (Doc. 91).[1] The

---

[1] Polymeric has also filed a Motion Seeking to Compel Disclosure Pursuant to Fed. R. Civ. P. 37(a) (Doc. 105). In this motion, filed approximately two weeks after the motions discussed here, Polymeric argues that many of the documents contained in MPT's privilege logs are not, in fact, privileged. These privilege issues are closely related to whether MPT should be required to turn over a complete copy of a search report, which is one of the issues addressed in the Motion to Compel of Defendant Polymeric Seeking Disclosure of Documents and Things Pursuant to Fed R.

Court GRANTS the motions in part and DENIES the motions in part.

**BACKGROUND**

Plaintiff MPT, Inc. ("MPT") accuses Polymeric Converting LLC ("Polymeric") and other defendants of infringing certain claims of U.S. Patent No. 5,417,790 (issued May 23, 1995) (the "'790 patent") and U.S. Patent No. RE 37,164 E (issued May 8, 2001) (the "'164 patent"). Polymeric requested certain documents by discovery requests to MPT and a subpoena to the Kennedy Group ("TKG"), a nonparty. Polymeric now seeks an Order compelling MPT and TKG to produce these documents.

MPT and TKG are separate corporate entities. MPT is owned by Michael, Patrick and Todd Kennedy. These three brothers are part owners of TKG along with their parents. Michael Kennedy is the president of MPT and the president and chief operating officer of TKG.

TKG and MPT are related in other ways. The patent application that eventually resulted in the '790 and '164 patents was originally assigned to TKG. TKG assigned its interest to Michael Kennedy in 1994, who thereafter assigned his interest to MPT in 1995. MPT then granted TKG a nonexclusive license to make and sell items covered by the patents at a royalty rate of 7% of the net sales price for all licensed products. That license was negotiated by Michael Kennedy on behalf of MPT and Bert Kennedy (Michael's father) on behalf of TKG.

The vast majority of all products sold under the patents are manufactured and sold by TKG under the license. MPT, on the other hand, has only three employees—Michael, Patrick and Todd Kennedy. MPT's offices are in TKG facilities. MPT pays TKG some sort of fee for

---

Civ. P. 34 and 37(a) (Doc. 91). The search report issue will be discussed with the other privilege issues in a separate memo.

overhead and other expenses, but the amount of that fee is not clear. MPT does not manufacture anything, has no salespeople, and does little or no marketing. According to Todd Kennedy, the purpose of setting up MPT was "[t]o create an entity to hold the patents that we possess."

Nonetheless, MPT does make some sales under its own name. MPT has sold three varieties of TKG-manufactured placards under TKG part numbers. There is conflicting testimony as to whether MPT has its own customers or whether TKG simply diverts some sales to MPT. In any event, TKG manufactures all of the products sold by MPT and delivers those products to MPT's customers. As was acknowledged by Michael Kennedy, "technically though we [MPT] pay for the placards. You know, there is an invoicing process that goes on."

MPT claims that it is entitled to its lost profits to compensate it for the infringement of Polymeric and the other defendants. Polymeric counters that it needs detailed information regarding TKG's production costs and sales in order to defend against MPT's lost profits claim. In this regard, Polymeric served a subpoena on TKG seeking the following documents:

> Documents that will allow Defendants to ascertain TKG's cost of manufacturing the placards sold to MPT, Inc. ("MPT").
>
> Documents that will allow Defendants to ascertain the price TKG charges customers other than MPT for placards alleged to be covered under the patents-in-suit.
>
> Polymeric also seeks the following discovery from MPT on this issue:
>
> Documents that will allow Defendants to ascertain the cost of manufacturing the placards manufactured by The Kennedy Group ("TKG") and sold by MPT and the back-up documentation for the "spreadsheets."

MPT and TKG have produced the following: (1) a document evidencing MPT's profit margin (MPT's price to its customers and TKG's price to MPT for each of the three products MPT sells); and (2) a document listing, for 1998-2004, TKG's net sales, MPT's net sales, and

3

MPT's royalty income from TKG's sales.  These are the spreadsheets referred to in Polymeric's discovery request to MPT.  MPT and TKG have refused to produce any other documents responsive to the discovery requests.

Polymeric's subpoena to the Kennedy Group also sought documents related to other issues.  The Kennedy Group did not object to producing these other documents.  The parties simply dispute whether production has been complete as to the following:

> The Avery Dennison/Fasson Roll documents that were identified by Brian Koski at his deposition as being in the possession of TKG and reflecting the structure of piggyback labels sold by Avery Dennison.

> Hard copies of the information in TKG's database as reflected on the copies of the menu screens that were produced.

Similarly, the parties dispute whether MPT has provided full disclosure of "[i]nformation concerning whether and when a litigation hold was placed on the destruction of email and the steps, if any, taken to restore deleted email."

Finally, Polymeric also seeks an order compelling MPT to provide "[t]he search report and all documents concerning it."  The search report is a document that was created early in the prosecution of the patents.  A redacted portion of this document was produced during discovery.  However, MPT, TKG and Michael Kennedy have asserted privilege with respect to the remainder of the search report.  Because Polymeric has also filed a separate motion that addresses this and other privilege issues, the search report will be addressed along with that motion.

### **STANDARD OF REVIEW**

Production of documents that are within the scope of Rule 26(b) may be requested of parties under Rule 34(b) and nonparties under Rule 45(b).  Rule 26(b) allows "discovery

4

regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears to be calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). If objections are filed or responses are believed to be incomplete or evasive, the party propounding the request may file a motion to compel under Rule 37(a) or Rule 45(c)(2)(B).

## **DISCUSSION**

The parties' disputes can be split into two general categories. First, MPT and TKG have objected to discovery relating to TKG's cost to produce placards and its prices to third parties on relevance grounds. Second, Polymeric believes that document production by TKG and MPT is incomplete.

### Kennedy Group Costs and Pricing

MPT seeks to recover lost profits equivalent to its profit margin multiplied by the defendants' total sales. Because MPT has little or no manufacturing, sales, or operations, it contends that its profit margin is equivalent to the price it charges its customers subtracted by the price it pays TKG. Polymeric counters that it must be allowed to look beyond the numbers provided by MPT to examine TKG's costs. It contends that the profit margin indicated by MPT's sales may not accurately represent the actual profit MPT should earn on sales of items used in the patented method.

It is beyond dispute that Polymeric would be entitled to examine TKG's manufacturing costs and pricing if TKG and MPT were a single entity. MPT does not argue otherwise. The patent damages statute provides as follows:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.

35 U.S.C. § 284.

Damages adequate to compensate for the infringement include the patentee's lost profits. *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999). A patent plaintiff seeking lost profits must demonstrate that but for the infringing activities of the defendants, it would have made the profits at issue. *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003). Such a showing must be supported by sound economic proof. *Id.*; *Grain Processing*, 185 F.3d at 1350; *see also Herbert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996) ("Damage awards can not be based upon speculation or optimism, but must be established by evidence."). Although the availability of lost profits is a question of law, the trial court has discretion in determining the proper methodology for determining the amount of lost profits. *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003). The patentee has the initial burden of demonstrating that it is entitled to lost profits. *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353 (2001). The burden then "shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits." *Micro Chem.*, 318 F.3d at 1122.

Although the Court may allow "any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement[,]" two common tests are the *Panduit* test and the two-supplier market test. *Id*. The *Panduit* test requires that the patentee establish the following:

(1) demand for the patented product;

(2) absence of acceptable non-infringing substitutes;

(3) manufacturing and marketing capability to exploit the demand; and

(4) the amount of the profit it would have made.

6

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 971 (Fed. Cir. 2000).  The two-supplier market test requires the patentee to show the following:

> (1) the relevant market contains only two suppliers;
>
> (2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer; and
>
> (3) the amount of profit it would have made from these diverted sales.

*Micro Chem.*, 318 F.3d at 1124.

Even a cursory examination of the relevant tests demonstrates that the discovery sought by Polymeric would be quite relevant to a defense of MPT's lost profits claim, *if* TKG and MPT were a single entity.  MPT/TKG would be required to demonstrate a capacity to produce additional products and the impact of that production on its profit margins.  MPT/TKG would also have to provide detailed information as to its costs.  *See, e.g.,* Chisum on Patents § 20.03[d].  Polymeric would need adequate discovery to counter these claims.

However, MPT and TKG are not a single entity.  Thus, they argue that only MPT's costs and capacity are at issue.  They claim that support for this proposition can be found in *Poly-America LP v. GSE Lining Tech. Inc*., 383 F.3d 1303 (Fed. Cir. 2004).  In *Poly-America*, the plaintiff Poly-America was a patent holder that sold no items under the patent.  *Id*. at 1305, 1311.  The defendant was found to infringe the patents, and the Federal Circuit moved to a discussion of a lost profits award.  *Id*. at 1310.

Poly-Flex was a sister corporation of Poly-America.  *Id*.  Standing alone as a nonexclusive licensee, Poly-Flex would not have been able to sue at all, let alone receive a lost profits award.  *Id*. at 1311.  Similarly, it was unlikely that Poly-America could recover lost profits on its own, since it had not sold any items under the patent.  *Id*.  Poly-America and Poly-

7

Flex attempted to avoid these rules by claiming that they operated as a single economic unit. *Id*. at 1310. In other words, the party with the patent and the right to sue (Poly-America) sought to recover for the lost profits of the third party that actually made and sold something (Poly-Flex). *Id*. The Federal Circuit refused to allow Poly-America to recover the lost profits of Poly-Flex:

> While we do not speculate concerning the benefits that the two companies reap from dividing their operations and separating the owner of the patent from the seller of the patented product, Poly-America and Poly-Flex may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure--in this case, the inability of the patent holder to claim the lost profits of its non-exclusive licensee. While Poly-America may have the right to sue under its patents, both as an owner and as a back-licensee, it can recover only its own lost profits, not Poly-Flex's.

*Id.* at 1311.

One of the "advantages" of the MPT/TKG corporate structure is that it provides the potential to inflate MPT's profit margin, and thus its lost profits. In this sense, MPT's concession that it is not attempting to recover the lost profits of TKG merely highlights the potential for manipulation of the lost profits award in this case. The patent holder in *Poly-America* did not argue that it could recover lost profits of its own right. Its only possibility for recovery of lost profits was to adopt its licensee's lost profits. In contrast, MPT's proposed lost profit calculation is MPT's profit margin multiplied by *the defendants'* sales. If TKG were the patent holder, it would presumably seek its own profit margin multiplied by *the defendants'* sales. Either way, the total number of sales available for the lost profits calculation is the same. The only difference is the profit margin used as a multiplier. Assuming that MPT's profit margin multiplier is greater than TKG's, it is to MPT's advantage not to attempt to recover for TKG's lost profits.

The minimal information disclosed by MPT and TKG thus far demonstrates how easily

MPT's profit margin multiplier could be manipulated. MPT sells TKG products under TKG part numbers. MPT has almost no operations, and the few sales it makes appear to be initiated by TKG. TKG manufactures and ships the products. MPT's involvement is largely limited to an accounting transaction.

TKG sells other products that are covered by the patents to other customers. Neither MPT nor TKG have presented any evidence that MPT's sales are representative of the overall profit margin on TKG sales. Because TKG's sales are over 30 times greater than MPT's sales,[2] it would be possible for TKG to sell products to MPT at subsidized prices or divert some highly profitable sales to MPT[3] with little or no impact on TKG's bottom line. However, such tactics could increase the profit margin multiplier available for MPT's infringement calculation exponentially.

According to MPT and TKG, the fact that their relationship might give MPT a larger profit margin is irrelevant. MPT believes that *Poly-America* stands for the proposition that "it is not relevant to inquire as between the companies how that profitability of the invention is divided" and that "it is not within the trial court's purview to inquire into the reasons for any such corporate division." Polymeric counters that *Poly-America* does not stand for the sweeping propositions proposed by MPT. Polymeric argues that *Poly-America* is merely a reaffirmation of the rule that a non-exclusive licensee does not have standing to sue for damages.

---

[2] In fact, MPT's 2004 revenue from its own sales was less than half of its revenue from the 7% royalty TKG paid on its sales.

[3] Even if TKG makes a profit on its sales to MPT, that does not prevent them from inflating the profit margin multiplier by diverting some of the most profitable sales to MPT.

Polymeric is correct.  Nowhere in *Poly-America* does the Federal Circuit indicate that courts should always blind themselves to the realities of corporate arrangements.  Rather, the Federal Circuit's concern was similar to the Court's concern in this instance: "Awarding lost profits to Poly-America [MPT] on the basis of its private arrangement with Poly-Flex [TKG] would synthetically create lost profits for Poly-America [MPT] . . . ."  *Id*. at 1311-12.

The issue is whether MPT is entitled to lost profits under the law.  Simply put, if the profit margin multiplier created by the MPT/TKG relationship is in excess of the actual profit margin MPT would have earned "but for" defendants' sales, MPT is not entitled to that amount in lost profits.  The result suggested by MPT and TKG—that parties are allowed to "synthetically create lost profits" in excess of the amount they could ever earn "but for" the infringement—would clearly run counter to law.  *Ericsson*, 352 F.3d at 1377.

*Poly-America's* dicta that "we do not speculate concerning the benefits that the two companies reap from dividing their operations and separating the owner of the patent from the seller of the patented product" does not support a *per se* rule that the relationship between a patent holding company and its related licensee is always irrelevant.  Indeed, the Federal Circuit has considered the relationship between related companies in a number of cases.  In one case, the Federal Circuit found that the related companies' attempt to game the normal rules applicable to patent cases qualified for a "chutzpah" award:

> Stripped to its essentials, CFM contends that a parent company can incorporate a holding company in another state, transfer its patents to the holding company, arrange to have those patents licensed back to itself by virtue of its complete control over the holding company, and threaten its competitors with infringement without fear of being a declaratory judgment defendant, save perhaps in the state of incorporation of the holding company. This argument qualifies for one of our "chutzpah" awards.  *See Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1584, 38 U.S.P.Q.2D (BNA) 1665, 1671 (Fed. Cir. 1996); *Checkpoint Sys., Inc. v.*

> *United States Int'l Trade Comm'n*, 54 F.3d 756, 763 n.7, 35 U.S.P.Q.2D (BNA) 1042, 1048 n.7 (Fed. Cir. 1995) (noting that "chutzpah" describes "the behavior of a person who kills his parents and pleads for the court's mercy on the ground of being an orphan"). While a patent holding subsidiary is a legitimate creature and may provide certain business advantages, it cannot fairly be used to insulate patent owners from defending declaratory judgment actions in those fora where its parent company operates under the patent and engages in activities sufficient to create personal jurisdiction and declaratory judgment jurisdiction.

*Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1271 (Fed. Cir. 1998).

In another case, the Federal Circuit held that a related company's sales were relevant to a patent holding company's damage award.  One form of patent damages is a reasonable royalty.  The reasonable royalty calculation requires the Court to conduct a hypothetical negotiation between the patentee and the alleged infringer.  *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).  In *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, the Federal Circuit considered this hypothetical negotiation in the context of a patent holding company and its parent.  425 F.3d 1366, 1377-78 (2005).  The patent holding company did not make, sell or use the patented product.  *Id*. at 1377.  The district court allowed evidence of the sales of the holding company's parent company.  *Id*.  The Federal Circuit approved, stating that "any hypothetical negotiation with the holding company must necessarily include the reality that the impact on the [parent] would weigh heavily in all decisions." *Id*. at 1378.

These cases demonstrate that courts may consider the relationship between the patent holder and a related company in patent cases and on issues of damages.  It is also quite possible that the exact issue faced by the Federal Circuit in *Union Carbide* might come to pass in this case.  Assuming *arguendo* that defendants are found to infringe, it is not guaranteed that MPT will be able to prove that it is entitled to lost profits.  Should that occur, the Court is required to allow damages "in no event less than a reasonable royalty for the use made of the invention by

11

the infringer." 35 U.S.C. § 284; *see also Crystal*, 246 F.3d at 1355 (holding that "the Patent Act mandates no less 'than a reasonable royalty' for every infringing sale"). This would put TKG's financials at issue.

In sum, the discovery sought by Polymeric is reasonably calculated to lead to the discovery of admissible evidence. While related companies may be able to allocate profits as they wish, a patent lost profits award—particularly an award that is based on a profit margin multiplier—cannot be based solely upon an accountant's choice as to which scenario will produce the highest award. To hold otherwise would allow patent plaintiffs to game the system for damage awards that exceed the amount they could actually receive "but for" the infringement. Accordingly, the Court GRANTS Polymeric's motion as to TKG's costs and sales information.

<u>Incomplete Production of Documents</u>

Polymeric contends that MPT has not provided it with complete responses regarding "(i) whether a litigation hold was placed on the destruction of email and, if so, when; [and] (ii) what, if any, steps are being taken to restore deleted email . . . ."[4] However, both MPT and its attorneys have attested that few if any emails relevant to the lawsuit have been deleted. They have admitted that other emails unrelated to the lawsuit have been deleted. They have also described in detail the steps they have taken to retain email records. MPT has been forthcoming with all information it has on this issue. There is no basis for an order compelling further production.

---

[4] In a separate motion, Polymeric also seeks production or *in camera* review of e-mails that MPT has claimed are privileged.

Polymeric also contends that Kennedy has not produced "The Avery Dennison/Fasson Roll documents that were identified by Brian Koski at his deposition as being in the possession of TKG and reflecting the structure of the piggyback labels sold by Avery Dennison" and "Hard copies of the information in TKG's database as reflected on the copies of the menu screens that were produced."

With respect to the former, TKG has represented that despite a diligent search it is unable to locate any such documents. There is no reason to compel the production of documents that do not exist. Regarding the latter, Polymeric's subpoena sought hard copies of menu screens that display "the identity of the source of products, by manufacturer name and product number," that are used to make particular TKG products. Polymeric does not argue that the main menu screens were not produced for these products. Instead, it argues in its Reply that it needs to view the background tabs with more detailed information. However, the screens produced by TKG provide the information sought by Polymeric, namely, the source of the products. TKG has produced all it was asked to produce.

### **CONCLUSION**

The Court GRANTS Polymeric's motion in part and DENIES Polymeric's Motion in part. The Court ORDERS TKG to produce the following:

Documents that will allow Defendants to ascertain TKG's cost of manufacturing the placards sold to MPT, Inc. ("MPT").

Documents that will allow Defendants to ascertain the price TKG charges customers other than MPT for placards alleged to be covered under the patents-in-suit.

The Court ORDERS MPT to produce the following:

Documents that will allow Defendants to ascertain the cost of manufacturing the

placards manufactured by The Kennedy Group ("TKG") and sold by MPT and the back-up documentation for the "spreadsheets."

IT IS SO ORDERED.

                                                /s/ Patricia A. Gaughan
                                                PATRICIA A. GAUGHAN
                                                United States District Judge

Dated: 2/9/06